**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3186-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JENNIFER SWEENEY,

     Defendant-Appellant.

_____

> Argued April 16, 2024 – Decided May 20, 2024
>
> Before Judges Mayer, Whipple and Augostini.
>
> On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 16-12-1998.
>
> Robin Kay Lord argued the cause for appellant (Law Offices of Robin Kay Lord, LLC, attorneys; Robin Kay Lord and Monika Mastellone, on the briefs).
>
> Monica do Outeiro argued the cause for respondent (Raymond S. Santiago, Monmouth County Prosecutor, attorney; Monica do Outeiro, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Jennifer Sweeney appeals from a May 6, 2022 judgment of conviction and sentence imposed after a jury found her guilty of murder and related offenses. We affirm the conviction but remand for resentencing.

We recite the facts from the pre-trial evidentiary hearings and the trial testimony.

Defendant met the victim, Tyrita Julius, through a social club for motorcycle enthusiasts known as the Ruff Ryders. Defendant and Julius dated for several years.

In 2015, Julius lived in Linden with her son and daughter. At that time, Julius's daughter attended high school, and her son attended a local college. Julius's mother and other family members also lived in Linden.

In August 2015, Julius met Hasan Nicely at a Ruff Ryders event. Nicely was a member of another social club for motorcycle afficionados. The two exchanged telephone numbers, started "talking," and began dating.

Because defendant shared a cellular telephone plan with Julius, defendant monitored Julius's cell phone activities. Defendant, upset Julius was interested in someone else, contacted Nicely using a blocked cell phone number. Defendant also looked up the phone numbers of other individuals who Julius contacted on her cell phone.

Around mid-November 2015, Julius broke up with defendant and continued her relationship with Nicely. Based on text messages uncovered through a lawful search of defendant's cell phone, defendant was unhappy about the breakup and Julius's new relationship.

On November 21, 2021, Nicely and Julius attended a Ruff Ryders event together. A Ruff Ryders member noticed defendant become visibly angry when Julius and Nicely danced together.

The first attempt on Julius's life occurred on November 24, 2015. On that date, Julius arranged to attend her son's college basketball game with her daughter and Nicely. Around 7:00 p.m. that evening, Julius planned to drive everyone to the basketball game. Julius walked out of her house to her son's car parked nearby, sat in the driver's seat, and waited for her daughter to finish getting ready. While walking to the car, the daughter saw a "chunky," "[k]ind of husky" Black man approach.

When the daughter got into the car, the man pulled out a gun, pointed it at the car's windows, and began shooting. Julius and her daughter were seated in the front driver and front passenger seats. Both women were struck by bullets.

A-3186-21

Even though she had been shot, Julius drove the car to escape the shooter. The car crashed into a nearby stop sign and telephone pole. At 7:16 p.m., the daughter called 9-1-1.

Police and medical personnel responded. The police spoke to the daughter, processed the crime scene, and canvassed the area for witnesses and evidence.[1] Witnesses gave the police a similar description of the shooter as the description provided by Julius's daughter.

Emergency medical personnel took Julius to the hospital. She had been shot multiple times and suffered significant injuries, requiring extensive surgery.[2] During the surgery, the doctors recovered a nine-millimeter bullet from Julius's body.[3] Julius remained in the hospital for thirty-nine days.

Because Julius did not want to see anyone, her mother restricted hospital visitors. However, family, certain friends, and defendant were permitted to visit Julius after the shooting.

---

[1] The police found eight nine-millimeter shell cases at the scene. After conducting tests, the police determined the shell casings were fired from the same weapon.

[2] Even after the hospital discharged her on January 2, 2016, Julius had difficulty walking and using her right arm.

[3] During Julius's autopsy, the medical examiner uncovered three additional bullets. The recovered bullets were consistent with a nine-millimeter weapon.

While Julius remained in the hospital, defendant told some of Julius's friends that she and Julius were dating again. Defendant also claimed she looked at engagement rings and planned to propose to Julius on a trip to Puerto Rico. During and after Julius's hospital stay, defendant continued to use information from their shared cellular telephone plan to discover men with whom Julius communicated, including Nicely.

Detective Kenneth Mikolajczyk with the Linden Police Department led the investigation into the November 2015 shooting. He took a video recorded statement from defendant on December 17, 2015.

During this statement, defendant told Mikolajczyk that she and Julius were together for "[a]lmost three years." Upon questioning by the detective, defendant admitted she and Julius broke up a few days before the shooting. However, defendant denied she and Julius had a fight.

Defendant told the detective she was at the Woodbridge Mall around 7:00 p.m. with a friend the night of the shooting. According to her statement, defendant was planning to attend a Ruff Ryders event at 9:00 p.m. that evening. Defendant told Mikolajczyk she was driving to the Ruff Ryders event and received a call from a club member saying Julius had been shot. Defendant explained she went straight to the hospital, along with her shopping friend.

Later, defendant drove the friend home and returned to the hospital. Defendant left the hospital around one or two o'clock in the morning.[4]

Between January 2016 and March 2016, Julius wanted to "remain[] friends" with defendant. At that time, Julius's daughter lived with an aunt in New York because Julius feared for her child's safety. Julius went to visit her daughter in New York. Due to Julius's physical limitations as a result of the shooting, Julius's mother arranged for a train attendant to assist Julius during the trip to New York. Julius returned to New Jersey on March 6, 2016.

On March 8, 2016, Julius went missing. That morning, Julius and a friend from Linden ran errands. Julius never told her companion she planned to see defendant later that day.

Later that same morning, defendant picked up Julius, and the two women spent the day together. Although defendant's friends explained defendant was excited to see Julius after she returned from upstate New York, defendant's cellular telephone records told a different story. Defendant continued to search Julius's cell phone records to learn who Julius contacted and who contacted

---

[4] After defendant's arrest in August 2016, the police discovered information from cell phone records contradicting defendant's statement to Mikolajczyk as to her whereabouts at the time of the November 2015 shooting.

Julius.  Defendant even searched Julius's cell phone information on the morning of March 8.

Julius's mother texted with Julius at 4:44 p.m. on March 8.  Thereafter, two friends tried to call Julius's cell phone, but the calls went to voicemail.

At 7:47 p.m. on March 9, defendant called her friend Donna, explaining she took Julius to the Long Branch train station.  Defendant asked if she could visit with Donna that evening.  Donna replied she was not home, but her husband was in the house.  Although defendant never previously visited Donna's husband without Donna present, defendant did so around 8:15 p.m. that evening.

While at Donna's house, defendant told Donna's husband about spending the day with Julius.  She also told him she left Julius at the Long Branch train station to catch a 7:15 p.m. train to Linden and gave Julius $100 cash, a shirt, and cookies.  During their conversation, defendant claimed she did not drive Julius to Linden because Julius "felt bad" asking defendant to drive from Long Branch to Linden.

Donna later called defendant to see if she was still at the house.  Defendant explained she left the house and then told Donna about spending the day with Julius.  Defendant also told Donna about planning to propose to Julius.  Defendant further told Donna that she was worried because her calls to Julius

7

went into voicemail. Donna also asked why defendant had not driven Julius to Linden because defendant typically drove to and from Linden on a regular basis.

On March 8, Julius's mother reported Julius missing to the Linden and Long Branch Police Departments. Julius's mother also contacted her nephew, who worked for New Jersey Transit, to see if he could confirm whether Julius boarded the train from Long Branch to Linden around 7:00 p.m. on March 8. The nephew stated there were two trains travelling north from Long Branch that evening—one at 6:55 p.m. and one at 7:17 p.m. After speaking with crew members on those trains, the nephew could not determine if Julius boarded either train.

The nephew requested and obtained video footage from the Long Branch train station depicting northbound trains departing the station around 7:00 p.m. on March 8. The nephew asked defendant to provide the precise time she left Julius at the station. Defendant initially said she dropped Julius off at 7:09 p.m. When the nephew reported he did not see Julius in the platform footage at that time, defendant claimed her view of the platform was blocked by an arriving train. Ultimately, the nephew never discovered Julius in any New Jersey Transit video footage from March 8.

A-3186-21

On March 9, friends and family had not heard from Julius and were unable to reach her by phone. Defendant claimed she also tried to reach Julius several times that day but was unsuccessful.

Also on March 9, defendant drove around Long Branch with Donna. During the drive, defendant pointed to a home owned by Andre Harris.[5] Harris went to high school with defendant and Donna. Defendant told Donna she recently reconnected with Harris. Defendant also told Donna the police kept questioning her about Julius's whereabouts. Additionally, defendant expressed concern that members of the Ruff Ryders would assume defendant had something to do with Julius's disappearance and retaliate against defendant. According to Donna, defendant then asked how long it would take to smell decomposing remains if Julius was deceased. Donna also said defendant wondered aloud why, if someone were hit in the head, that person would bleed out of their ears.

---

[5] Harris filed a separate appeal. Because Harris's appeal and this appeal are interrelated, we incorporate the facts from this opinion in our opinion issued on the same date regarding Harris's appeal. See State v. Harris, No. A-3228-21 (App. Div. May 20, 2024).

By the summer of 2016, defendant started dating someone else. Defendant continued interacting normally with her friends and co-workers and no longer appeared depressed about Julius's disappearance.

After receiving the missing person report from Julius's mother, the Monmouth County Prosecutor's Officer (MCPO) worked with the Linden Police Department to find Julius. Brian Weisbrot of the MCPO worked with Detectives Kenneth and Kevin Mikolajczky of the Linden Police Department in the search for Julius.

Because defendant was presumably the last person to see Julius, Weisbrot and Kenneth Mikolajczyk informally spoke to her on March 11. The officers arrived at defendant's house at 10:40 p.m. Defendant agreed voluntarily to provide a more formal statement to the police and drove with her mother to MCPO later that same evening to give a recorded statement.

During this recorded statement, defendant told the officers she picked Julius up around 11:50 a.m. on March 8. According to defendant, the two women went to lunch, then went to the Eatontown motor vehicle office, and then

went to defendant's Tinton Falls home.[6] Defendant told the officers they left Tinton Falls at 6:40 p.m., and defendant deposited Julius at the Long Branch train station at around 7:00 p.m. to catch a northbound train departing at 7:17 p.m.

Defendant also told the officers she went to Donna's house in Long Branch after leaving Julius at the train station and stayed at Donna's house for about an hour. Thereafter, defendant claimed she returned to the train station because she had "a weird feeling" and "didn't want to drop [Julius] off to begin with, so [she was] just nervous." Defendant explained she met another friend for dinner that evening.[7]

Defendant stated Julius wanted to take the train to Linden so defendant would not have to drive to Linden and then back to Long Branch. Defendant further told the officers she texted Julius at 8:15 and 10:29 p.m., and called Julius around 8:00 a.m. the following morning, but Julius never responded.

_____

[6] The police obtained surveillance videos from two of these locations. The videos confirm the timing of defendant's lunch with Julius and their arrival and departure from the motor vehicle office.

[7] The police also obtained surveillance video from the restaurant, which corroborated defendant's statement about meeting a friend for dinner on March 8.

Defendant explained she started to worry when Julius's son called her on March 9 to report Julius never came home.

Defendant denied hurting Julius. She also told the officers she had no idea where Julius might have gone on March 8.

Defendant expressly consented to the officers' searching her cell phone. However, the cell phone search did not reveal defendant's communications with Harris because defendant deleted them. Defendant never mentioned Harris during the March 2016 recorded statement.

During this interview, defendant agreed to allow the officers to search her car and home. Defendant and her mother drove home in their car, and the officers drove in their vehicle. The officers did not conduct a forensic investigation of defendant's car at that time.[8]

As part of their investigation, the police looked into defendant's reported whereabouts on March 8 after leaving the Long Branch train station. In reviewing surveillance video provided by New Jersey Transit, the police were unable to corroborate defendant's differing statements regarding the timing of Julius's train to Linden. The police also noted Donna's house was only one mile

---

[8] Months later, after defendant's arrest, the police conducted a forensic analysis of defendant's car and found nothing of evidentiary value.

from the Long Branch train station but, according to defendant's timeline of the events on the evening of March 8, there was a one-hour gap between the time defendant left Julius at the train station and defendant's arrival at Donna's home.

On April 8, while canvassing the area around defendant's home and the cell phone tower where Julius's cell phone last pinged as part of the search for Julius, the police spoke to Harris. Harris lived about one mile from the cell phone tower of Julius's last cell phone transmission. Julius's cell phone was last used at 7:02 p.m. on March 8, in the area of Joline Avenue and Myrtle Avenue or McClelland Street in Long Branch, not far from Harris's home. Harris told the police he knew defendant from high school but did not mention whether or not he knew Julius.

The police also obtained and reviewed cell phone data for cell phones used by defendant, Harris, and Julius, including real-time data, historical records relating to calls and text messages, and records relating to the locations of those cell phones proximate to the date of Julius's disappearance. In reviewing defendant's historical cell phone records, the police discovered numerous calls between defendant and Harris on November 22, 23, 24, and 25, 2015. On November 22, 2015, just days before Julius was shot, defendant contacted Harris

at 3:08 a.m. and 3:23 a.m. Harris sent a text message to defendant at 7:04 a.m. on November 22.

On November 24, 2015, defendant communicated with Harris at 12:21 p.m., 12:49 p.m., 2:07 p.m., 5:02 p.m., 6:26 p.m., 6:27 p.m., 6:53 p.m., 7:09 p.m., 7:11 p.m., 7:13 p.m., 7:17 p.m.,[9] 7:27 p.m., 7:39 p.m., and 7:44 p.m. The cell phone location data revealed that the communications between Harris and defendant between 7:09 p.m. and 7:13 p.m. on November 24 were made while defendant and Harris were in Linden and near Julius's home.

The cell phone information further revealed multiple calls between defendant and Harris during the seven o'clock hour on November 24 as both left the area of Julius's home. At 7:27 p.m., defendant texted a friend that she was going to the mall to buy sneakers. This text was inconsistent with defendant's statement to the Linden police that she was in the Woodbridge Mall at 7:00 p.m. on the day of the shooting.

Additionally, the day after the shooting, the cell phone records confirmed defendant communicated with Harris numerous times: at 7:15 a.m., 7:23 a.m., 9:33 a.m., 10:33 a.m., 11:04 a.m., 11:09 a.m., and 11:29 a.m.

---

[9] This communication occurred one minute after Julius's daughter called 9-1-1 to report her mother had been shot.

The police also examined the cell phone records before and after the date of Julius's disappearance. Defendant's cell phone records for March 7, 2016, revealed a call between defendant and Harris at 9:20 p.m. On March 8, 2016, the cell phone records showed defendant and Harris communicated at 7:40 a.m., 7:54 a.m., 8:30 a.m., and 8:36 a.m.

On March 8, 2016, shortly after 11:00 a.m., the cell phone location records placed Julius and defendant in their respective homes. Around 11:27 a.m., defendant's cell phone traveled in a northerly direction, and defendant placed a call to Harris at that time.

At 12:19 p.m., there was an outgoing call from Julius's phone. Julius's cell phone traveled in a southerly direction at the time of this call. The records next indicated a series of phone calls from a location near defendant's home placed by Julius's cell phone at 4:41 p.m., 4:46 p.m., and 4:47 p.m.

Around 6:00 p.m. on March 8, Harris received a series of communications from defendant. Defendant's communications were from a location near her home to Harris's phone located near his home in Long Branch.

At 7:02 p.m., Julius's cell phone made a call near Myrtle Avenue in Long Branch. This call did not originate near the Long Branch train station. The timing of the call contradicted defendant's statements about taking Julius to the

15

Long Branch train station around 7:00 p.m. Further, there were outgoing calls from defendant's phone at 7:47 p.m. and 7:49 p.m., and an incoming call to defendant's phone at 8:06 p.m. These phone calls were sent and received while defendant's phone was in the vicinity of Myrtle Avenue in Long Branch, via the same cell tower as Julius's phone at 7:02 p.m.

Based upon the cell phone records, the police began investigating Harris. The police compared Harris's cell phone records to defendant's cell phone records. The police also noted Harris's physical description matched the description of the November 24, 2015 shooter provided by Julius's daughter. The police also obtained Harris's EZ Pass records. According to the EZ Pass records, Harris travelled southbound on the Garden State Parkway at 7:55 p.m. on the day Julius was shot.

On August 16, 2016, the police arrested Harris on an outstanding traffic warrant and took him to the station to be interviewed. In his statement to the police, Harris initially denied any involvement in Julius's shooting or disappearance. However, after being confronted with evidence against him, Harris admitted shooting Julius on November 24, 2015, stated he shot Julius at defendant's behest, and helped defendant bury Julius's body on March 8, 2016.

16

Also on August 16, 2016, the police searched Harris's home pursuant to a warrant. The police discovered Julius's body buried in the backyard with an electrical cord around her neck.

A medical examiner (ME) examined Julius's body. According to the ME's examination, there were no facial fractures, no hemorrhages or discoloration of the eyes, and no fractures of the neck bone or cartilage. Nor did the ME find evidence that Julius's death was the result of natural causes. The ME observed discoloration on Julius's frontal scalp and neck musculature. Based on his examination of the body, the ME concluded Julius died by "homicidal violence including ligature strangulation."

Harris agreed to testify against defendant pursuant to a negotiated plea agreement and a cooperation agreement. Under these agreements, Harris agreed to testify truthfully at defendant's trial and the State agreed to recommend a sixteen-year aggregate sentence, subject to No Early Release Act (NERA), N.J.S.A. 2C:43-7.2(a), in return for his guilty plea on counts one, two, three, five, and eight in this matter and one count in a separate, unrelated indictment in another matter.

At trial, Harris testified he met defendant during high school. According to Harris, he lost touch with defendant after high school. However, he and

17

defendant reconnected in the summer of 2015. At that time, Harris was involved in a contentious divorce with his then-wife.

Defendant told Harris she was dating Julius but suspected Julius was cheating on her. According to Harris, defendant claimed to have seen him out with another woman. Harris wanted to keep his dalliances from becoming public because it would complicate issues related to his divorce, particularly custody of his children.

Harris testified defendant called him on November 23, 2015, and spoke to him about an argument she had with Julius a week earlier. Defendant told Harris she was "frustrated" and "had to get rid of [Julius]." Harris further testified defendant threatened to tell his wife about his extramarital relationship if he refused to help defendant.

Harris told the jury he got into his car the next morning and saw a note on his dashboard. The note depicted an arrow pointing toward the car's glove compartment. When Harris opened the glove compartment, a nine-millimeter gun fell out. Harris returned the gun to the glove box and contacted defendant. Defendant told Harris to meet her at 6:00 p.m. on November 24 at an address in Linden.

A-3186-21

When he arrived in Linden, Harris pulled his car next to defendant's vehicle. Harris saw a man in the passenger seat of defendant's car holding a gun in his lap. When Harris asked defendant to explain, she told Harris to shoot Julius. Defendant showed Harris a photograph of Julius, described Julius's car, and provided the car's location.

According to Harris, defendant threatened to shoot him or his children if he did not shoot Julius. Because defendant sat next to a man with a gun in his lap and showed Harris photographs of his children on her cell phone, Harris believed defendant's threats. The police subsequently discovered defendant researched information about the school Harris's children attended, including directions to the school and the school's dismissal procedures.

Harris testified he was scared of defendant based on her affiliation with the Ruff Ryders, which he believed to be a "gang." Because Harris feared defendant and believed her threats to harm him or his children, Harris shot Julius on November 24, 2015.

In hindsight, Harris testified he made a bad decision in shooting Julius. However, Harris explained he did not regret choosing his family over a person he did not know.

19

A few days after shooting Julius, Harris returned the nine-millimeter gun to defendant. Defendant expressed frustration that Harris "didn't do [his] job" and she was going to have to go to Julius's hospital and "play her part."

Harris also testified regarding his communications with defendant in early March 2016. Specifically, Harris stated he spoke to defendant on March 7, 2016, and defendant called him multiple times on March 8. His testimony was corroborated by cell phone records obtained by the police.

According to Harris, at 6:01 p.m. on March 8, he received a phone call from defendant while coaching his son's basketball team in Middletown. Defendant asked if Harris was home and he told her no, but responded he might be home later.

Harris testified he returned to his Long Branch home sometime after 6:00 p.m. on March 8. Because he heard his dog barking, Harris went to the back door and found defendant standing at the door. Defendant asked if Harris had string to tie down the trunk of her car. Harris offered defendant some twine, which she rejected as not strong enough. Harris then offered defendant an electrical cord, which she accepted. Harris shut the door and went about his business until the dog started barking again. When Harris returned to the back

A-3186-21

door, defendant asked Harris to put the dog elsewhere so she could talk to Harris. After he stowed the dog, Harris spoke with defendant.

Harris testified defendant said she needed his help and to follow her to the front of the house. Harris went outside and saw defendant's car in his driveway. When defendant opened the driver's side door of her car, Harris saw someone in the passenger seat.

Harris next testified defendant asked if he had a garbage can to help her "hide this." Harris then discovered Julius dead in the passenger seat. Julius had his electrical cord wrapped around her neck, and blood seeping from her right ear.

According to Harris, defendant spoke to Julius's dead body. Defendant said, "[I]f I can't have you[,] no one can." Harris explained defendant seemed to be "in a rush, disoriented" and said she "wanted to get to a train station in Long Branch for whatever reason."

Because Harris lacked a garbage can large enough to fit a person, he got a tarp and placed the tarp next to defendant's car. Harris then laid Julius's body on the tarp. At the same time, Harris saw defendant remove the SIM card from a cell phone and put the card in her pocket. Harris also saw a twenty-two-caliber handgun in defendant's pocket.

21

Harris dragged the tarp to his backyard, dug a shallow grave, and placed Julius's body in the ground. Harris testified defendant stood watching and acted as a look out. According to Harris, defendant appeared "distraught, upset, [and] kind of crying at the same time."

At one point, Harris testified defendant said to Julius's body, "[A]ll you had to do was say yes." Harris explained defendant kept repeating, "[I]f I can't have you then nobody can have you." Defendant then told Harris, "[N]o matter what, if anybody ever ask[s] you, I took her to the train station." Defendant repeated that command as she left Harris.

Harris told the jury he next spoke to defendant after he talked to the police on April 8. Harris told defendant the police came to his house. Defendant asked what Harris said to the police, and he stated he gave them no information.

After this conversation, defendant and Harris agreed to meet. The next week, defendant arrived at Harris's home "very frustrated because she felt like people weren't believing her" regarding Julius's disappearance. Defendant also brandished the twenty-two-caliber handgun and told Harris to keep his mouth shut.

Harris further testified he asked defendant what she planned to do with Julius's body. Defendant claimed she was going to remove the body, but she

22

never did. Harris never raised the issue again, and he never moved the body. Harris explained it was defendant's problem "to deal with," and he "wasn't going to get involved with it anymore."

In December 2016, defendant was indicted, along with Harris, on the following counts: first-degree attempted murder of Julius and her daughter on November 24, 2015, N.J.S.A. 2C:5-1 and 2C:11-3 (counts one and two); first-degree conspiracy to commit murder related to the November 24 attempted murder, N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:11-3(a) (count three); second-degree unlawful possession of a weapon on November 24, 2015, N.J.S.A. 2C:58-4 and N.J.S.A. 2C:39-5(b) (count four); second-degree possession of a weapon for an unlawful purpose on November 24, 2015, N.J.S.A. 2C:39-4(a) (count five); first-degree purposeful or knowing murder on March 8, 2016, N.J.S.A. 2C:11-3(a)(1) and/or (a)(2) (count six); third-degree possession of a weapon for an unlawful purpose on March 8, 2016, N.J.S.A. 2C:39-4(d) (count seven); second-degree disturbing or desecrating human remains, N.J.S.A. 2C:22-1(a)(1) and/or (a)(2) (count eight); and fourth-degree tampering with physical evidence, N.J.S.A. 2C:28-6(1) (count nine).

Defendant and Harris filed several pretrial motions. Prior to deciding the motions, the judge held multiple days of hearings, including testimonial

23

hearings. The judge issued a lengthy written opinion addressing the motions. Relevant to this appeal, the judge denied defendant's motion to suppress her statements to the police.

The matter proceeded to trial, starting on August 10, 2021, and ending on September 3, 2021. In accordance with his plea agreement, Harris testified against defendant at trial. At the close of the State's case, defendant moved for a judgment of acquittal. The judge denied the motion, except he dismissed the attempted murder charge under count two. On September 3, 2021, the jury found defendant guilty on the remaining counts.

At the May 6, 2022 sentencing hearing, the judge sentenced defendant as follows: life in prison, subject to NERA on the murder conviction (count six); a concurrent ten year sentence on the conviction for disturbing human remains (count eight); a consecutive twenty year sentence, subject to NERA, for the attempted murder conviction (count one); and a concurrent ten year sentence, with five years of parole ineligibility, on the conviction for unlawful possession of a handgun without a permit (count four). The judge merged the remaining convictions—specifically, he merged counts three and five with count one, count seven with count six, and count nine with count eight. The judge entered the judgment of conviction on June 10, 2022.

On appeal, defendant raises the following arguments:

POINT I

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS HER DECEMBER 17, 2015 STATEMENT, AS IT WAS NOT MADE VOLUNTARILY.

POINT II

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS HER MARCH 11, 2016 STATEMENT, AS IT WAS THE PRODUCT OF AN ILLEGALLY OBTAINED, INVOLUNTARY STATEMENT.

POINT III

THE TRIAL COURT'S FAILURE TO ADEQUATELY INSTRUCT THE JURY ON PERTINENT JURY CHARGES DENIED THE DEFENDANT DUE PROCESS AND A FAIR TRIAL. (Partially Raised Below)

A. The Complexity and Length of the Jury Charges, Along with the Trial Court's Failure to Fashion a Tailored Unanimity Charge, Created a Reasonable Probability that the Murder Verdict was Not Unanimous. (Not [R]aised [B]elow)

B. The Trial Court Erred in Failing to Charge Passion Provocation Manslaughter and Attempted Passion Provocation Manslaughter Despite Counsel's Request for the Instruction.

C. The Trial Court's "Testimony of a Cooperating Codefendant" Charge was Fatally Incomplete,

A-3186-21

Which Constituted Plain Error and Warrants Reversal. (Not [R]aised [B]elow)

POINT IV

DEFENDANT'S CONVICTION MUST BE REVERSED AS THE INTEGRITY OF BOTH THE JURY SELECTION AND JURY DELIBERATION PROCESSES WERE IRREPARABLY TAINTED. (Not [R]aised [B]elow)

A. A Failure to Adequately Moderate the Virtual Jury Panel Caused Biased Jurors to Taint the Jury Pool, Including Impaneled, Deliberating Jurors.

B. Two Jurors Who Were Clearly Not Qualified to Deliberate Fairly and Impartially Tainted the Jury Process and Denied Defendant a Fair Trial.

C. The Court Erred in Forcing a Third Juror to Participate and Deliberate.

D. A Juror was Improperly Excused by the Court as No Reasoning for the Excusal was Placed on the Record.

E. Covid-Related Issues Were Not Properly Addressed with the Jury to Ensure a Fair and Impartial Jury.

F. A Juror Who Flatly Refused to Deliberate Tainted the Jury Process and Calls into Question the Unanimity of the Verdict.

POINT V

THE MEDICAL EXAMINER'S TESTIMONY CONSTITUTED PURE SPECULATION AND WAS COMPRISED OF NET OPINIONS THAT THE

26

DEFENSE HAD NO NOTICE OF, WHICH WAS SO PREJUDICIAL IT DEPRIVED THE DEFENDANT OF A FAIR TRIAL.

POINT VI

THE PROSECUTOR COMMITTED MISCONDUCT DURING SUMMATION WHERE HIS COMMENTS WERE IMPROPER AND SO PREJUDICIAL AS TO DENY DEFENDANT A FAIR TRIAL AND REQUIRE REVERSAL OF HER CONVICTIONS. (Not [R]aised [B]elow)

A. The Prosecutor's Comments in Summation Improperly Shifted the Burden to the Defense.

B. The Prosecutor's Conclusions in Summation Exploited Facts that were Not Adduced at Trial and Not Supported by the Evidence.

C. The Prosecutor Improperly Vouched for the Credibility of Its Cooperating Witness.

POINT VII

THE TRIAL COURT IMPROPERLY PERMITTED THE STATE TO USE DEFENDANT'S PRE-ARREST SILENCE AGAINST HER AT TRIAL, RESULTING IN MORE BURDEN SHIFTING.

POINT VIII

DEFENDANT'S SENTENCE WAS IMPROPERLY BASED UPON DISPUTED FACTS AND EXCESSIVELY DISPROPORTIONATE TO HER CODEFENDANT'S SENTENCE.

A-3186-21

A. The Trial Court Improperly Considered Disputed Facts in Support of the Imposition of Its Sentence.

B. The 95-Year versus 16-Year Disparity Between Defendant Sweeney and Codefendant Harris's Sentences was Not Justifiable.

C. The Trial Court Erred in Imposing Two Consecutive Maximum NERA Sentences.

I.

We first address defendant's argument that the judge erred in denying her motion to suppress her December 17, 2015 and March 11, 2016 statements to the police. Regarding the December 17 statement, defendant asserts she was "coerced . . . into giving a statement" "by way of a sham grand jury subpoena." Regarding the March 11 statement, defendant contends that statement was the poisonous fruit of the illegally obtained December 17 statement. We reject these arguments.

Prior to ruling on defendant's motion, the judge conducted multiple hearing days and took testimony from the following individuals: Detective Weisbrot of the MCPO; Detective Kenneth Mikolajczyk of the Linden Police

Department; and Jill O'Malley, an assistant prosecutor with the Ocean County Prosecutor's Office.[10]

Regarding defendant's December 17, 2015 statement, Mikolajczyk and O'Malley testified that, in connection with investigating Julius's shooting in November 2015, the UCPO issued grand jury subpoenas to several people the police wanted to interview, including defendant. According to the suppression hearing testimony, the police were not investigating defendant regarding the shooting. Nor had the police targeted defendant at that time. Rather, the police and UPCO considered defendant a witness.

Mikolajczyk testified he wanted to speak to defendant because he understood she and Julius were in a relationship. The detective "figured . . . [defendant] would be closest to [Julius] and she may have some information that would lead [him] to who may have hurt [Julius]." O'Malley also testified defendant's relationship with Julius was "[s]omething to consider" regarding a possible motive for the shooting.

According to the hearing testimony, on December 16, 2015, police officers with the Linden Police Department left a subpoena at defendant's home

---

[10] O'Malley worked as an assistant prosecutor in the Union County Prosecutor's Office (UCPO) at the time of defendant's December 2015 statement to the police.

with a copy of Mikolajczyk's business card. The following day, police officers with the Tinton Falls Police Department hand-delivered a subpoena to defendant. The subpoena "commanded" defendant "to appear in person before the Grand Jury of Union County" at 1:00 p.m. on December 18, 2015. The grand jury subpoenas sought information from witnesses regarding the November 24, 2015 shooting.

Detective Mikolajczyk testified he did not know whether a grand jury had been seated on December 18. In fact, the UCPO commenced a grand jury proceeding on December 18, and O'Malley reserved the grand jury room from 1:00 p.m. to 4:00 p.m. to hear witness testimony on that date.

According to Mikolajczyk, he understood the subpoenas were issued so witnesses could contact him. Because several witnesses contacted the detective in response to the subpoenas, no grand jury testimony was taken on December 18. Instead, Mikolajczyk took statements from the witnesses who contacted him. Defendant was one of the witnesses who telephoned Mikolajczyk.

Mikolajczyk and O'Malley testified regarding defendant's December 2015 statement to the police. On December 17, 2015, defendant called O'Malley at the telephone number listed in the subpoena. During that conversation, O'Malley advised defendant could appear before the grand jury on December

30

18, or, in lieu of appearing before the grand jury, defendant could contact Mikolajczyk and provide information, if any, defendant had regarding the shooting.

After speaking to O'Malley, defendant called Mikolajczyk on December 17. The detective explained he wanted to speak with defendant because she was known to be close to Julius and might provide information relevant to the shooting. According to Mikolajczyk, defendant was cooperative and volunteered to speak with him in person that evening.

Defendant drove herself to the Linden Police Department and arrived around 4:15 p.m. Before starting the recorded interview, Mikolajczyk told defendant she did not have to speak with him. However, this comment was not captured as part of the recorded statement. The detective did not issue the Miranda[11] warnings. Nor did he state defendant could consult with a lawyer.

At the time of the interview, defendant was not under arrest. She was not charged with any crimes. She was not handcuffed or in custody. Because Mikolajczyk considered defendant a witness, he treated her as such.

---

[11] Miranda v. Arizona, 384 U.S. 436 (1966).

Mikolajczyk video-recorded defendant's interview for his convenience. We previously summarized defendant's December 17, 2015 statement. At the conclusion of the interview, defendant left the Linden police station.

At the suppression hearings, Detective Weisbrot of the MCPO testified regarding defendant's March 11, 2016 recorded interview. On that date, Weisbrot was assigned to investigate the missing person report concerning Julius. He and other members of the MCPO met with officers from the Linden Police Department, including Detectives Kenneth and Kevin Mikolajczyk. The group discussed the missing person report made by Julius's mother, and the November 2015 shooting of Julius. As of March 2016, the shooting remained unresolved and under investigation.

The Long Branch Police Department contacted Julius's cellular telephone provider and obtained location data. However, they were unable to locate Julius's cell phone.

Since defendant was the last person to have seen Julius before she disappeared, the Long Branch police contacted the Police Department in Tinton Falls, where defendant lived with her mother. The police wanted to ascertain whether Julius might be at defendant's home. They eventually determined Julius was not at defendant's house. However, defendant's mother confirmed Julius

32

had been at the home on March 8, and defendant took Julius to the Long Branch train station.

Weisbrot testified he contacted Julius's cellular telephone provider to obtain additional records to learn where Julius had been and who she contacted prior to her disappearance. Those records showed the last call received or sent by Julius's cell phone was in Long Branch, near Joline Avenue and Myrtle Avenue.

On the night of March 11, 2016, and into the early morning hours of March 12, Weisbrot and Kenneth Mikolajczyk interviewed defendant. At that time, the police did not have Julius's cell phone records.

The officers initially arrived at defendant's home at approximately 10:40 p.m. on March 11. Defendant's mother also was in the house.

The officers told defendant they were assigned to investigate Julius as a missing person and wanted to speak with defendant because she was the last person to see Julius. At the time, the officers considered the matter a missing person investigation, not a homicide investigation. The officers asked if defendant would be willing to drive to the MCPO for questioning. They did not take defendant into custody. Nor did the officers have any basis for doing so. Thus, the officers did not provide Miranda warnings to defendant.

According to the police, defendant was "very cooperative" and agreed to be interviewed at the MCPO. The officers left defendant's home and drove to the MCPO in Asbury Park. Defendant, accompanied by her mother, travelled to the MCPO separately.

At the MCPO, the officers met defendant in an interview room. Defendant's mother remained in the lobby. For their convenience, the officers recorded the interview. Prior to the interview, the officers did not advise defendant of her Miranda rights because defendant was not under arrest or in custody. Weisbrot further explained defendant was free to leave the MCPO at any time and allowed her to keep her cell phone during the interview.

We previously summarized defendant's statements during the March 2016 interview. The interview ended at 2:48 a.m., and defendant drove home with her mother. After the interview, the two officers drove to defendant's home because defendant agreed the officers could search her car and home.

The officers searched defendant's car and a portion of defendant's house. During the search, they found and removed a t-shirt belonging to Julius from defendant's car and a restaurant receipt from defendant's bedroom.

The investigation into Julius's disappearance continued. On August 16, 2016, the day the police interviewed Harris, the police arrested defendant.

In an extensive and detailed written opinion, the judge denied defendant's motion to suppress her statements to the police. The judge found defendant's December 17, 2015, statement was voluntary and concluded she was not in custody at that time because the police considered defendant a witness rather than a suspect.

The judge also rejected defendant's argument that the grand jury subpoena was a "sham," relying upon O'Malley's credible testimony that the grand jury was in session on December 18, and O'Malley was prepared to take defendant's testimony if she appeared on that date. The judge credited O'Malley's testimony that she opened a grand jury proceeding into Julius's shooting and, as of the date of the grand jury proceeding, there were no arrests or charges related to the shooting. Similarly, the judge accepted as credible O'Malley's testimony that she reserved several hours for the grand jury to take testimony from defendant and other witnesses who received subpoenas.

The judge further found defendant's argument that her statement on December 17 was involuntary because she had been subpoenaed to be contrary to the factual record. According to the judge, the record reflected the following: defendant chose to speak with the police rather than testify before the grand jury; defendant contacted Mikolajczyk to arrange the date and time of the

35

interview; defendant drove to the police station for the interview; defendant was never restrained or otherwise placed into custody by the police during the interview; and Mikolajczyk advised defendant she had no obligation to speak with him. Under these circumstances, the judge found no obligation for the police to issue Miranda warnings and no basis for finding the defendant's statement involuntary.

The judge also found defendant's March 11, 2016 statement was voluntary and that she was not in custody during that interview. The judge explained defendant voluntarily traveled to the MCPO for that interview with her mother and was never restrained or deprived of her freedom of movement. Because the judge concluded defendant was not in custody, he found the police had no obligation to issue Miranda warnings.

In reviewing a trial court's ruling on a suppression motion, we defer to the court's factual findings if those findings are supported by sufficient credible evidence in the record. State v. O.D.A.-C., 250 N.J. 408, 425 (2022); State v. Sims, 250 N.J. 189, 210, cert. denied, Sims v. N.J., ___ U.S. ___, 143 S. Ct. 409 (2022). Our deferential standard of review applies regardless of whether the statement is video-recorded or otherwise recorded or documented. State v. Tillery, 238 N.J. 293, 314 (2019).

However, we review a trial judge's legal conclusions de novo, including the validity of a defendant's waiver of the right against self-incrimination and the voluntariness of a defendant's statement. Arizona v. Fulminante, 499 U.S. 279, 287 (1991); O.D.A.-C., 250 N.J. at 425.

The right against self-incrimination is protected under both federal and state law. The federal protection arises under the Fifth Amendment to the Constitution, U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."), applicable to the States under the Fourteenth Amendment, U.S. Const. amend. XIV. State v. Ahmad, 246 N.J. 592, 609-10 (2021). State protection in New Jersey arises under statutory and common law. N.J.S.A. 2A:84A-19; N.J.R.E. 503; O.D.A.-C., 250 N.J. at 420. New Jersey's protection against self-incrimination is more expansive than its federal counterpart. O.D.A.-C., 250 N.J. at 420.

A person may waive the right against self-incrimination. State v. Vincenty, 237 N.J. 122, 132 (2019). However, in the context of custodial interrogations, "[l]aw enforcement officers must first advise a suspect of the right against self-incrimination before attempting to obtain a waiver of the right." Ibid. Known as the Miranda warnings, a defendant must be advised of the following: the right to remain silent; that anything said could be used in a

court of law; the right to have an attorney present and, if a defendant cannot afford an attorney, to have an attorney appointed for them; and that these rights may be invoked at any time during the interrogation. Miranda, 384 U.S. at 479; O.D.A.-C., 250 N.J. at 412, 420.

The State bears the burden of proof beyond a reasonable doubt that a defendant's waiver of the right against self-incrimination was "knowingly, intelligently, and voluntarily waived" under the totality of the circumstances. O.D.A.-C., 250 N.J. at 420-21, 425. "That burden of proof is higher than under federal law, which requires the government to 'prove waiver only by a preponderance of the evidence.'" O.D.A.-C., 250 N.J. at 420 (quoting Colorado v. Connelly, 479 U.S. 157, 168 (1986)).

"Miranda is triggered only when a person is in custody and subject to questioning by law enforcement." Ahmad, 246 N.J. at 610. Whether someone is in custody, requiring issuance of the Miranda warnings, is a fact-sensitive inquiry. Id. at 611. Although no formal arrest or physical restraints are required to find a person was in custody, being in custody entails a "significant deprivation" of one's "freedom of action." State v. Bullock, 253 N.J. 512, 533 (2023) (quoting State v. P.Z., 152 N.J. 86, 103 (1997)); State v. Erazo, 254 N.J. 277, 298-99 (2023).

In this case, there is no evidence defendant suffered any substantial deprivation of her freedom while being interviewed by the police in December 2015 or March 2016. Additionally, there is sufficient evidence in the record supporting the judge's finding that defendant's statements to the police were voluntary.

Defendant's reliance on Garrity v. New Jersey, 385 U.S. 493 (1967), is misplaced. In Garrity, the petitioners were subjected to coercive conduct when the "choice imposed on [them] was one between self-incrimination or job forfeiture." Id. at 496-98. Specifically, the petitioners were told that if they refused to answer questions, they would be subject to removal from office. Id. at 494. Here, defendant was under no such compulsion to self-incriminate.

Under the totality of the circumstances, the judge properly admitted defendant's December 2015 statement to the police finding she was not in custody and her statement was voluntarily. Because defendant's December 2015 statement was valid, defendant's fruit-of-the-poisonous-tree argument raised for the first time on appeal regarding her March 2016 statement—that the March 2016 statement was the product of the unlawfully obtained December 2015 statement—fails as well. See State v. O'Neill, 193 N.J. 148, 171 n.13 (2007).

Even on the merits, defendant's March 2016 statement was valid under the totality of the circumstances. Regarding the March 2016 statement, defendant agreed to meet with the police who were investigating Julius's disappearance. Defendant and her mother drove to and from the MCPO in their own car. Defendant was not under arrest. Nor was she confined or restrained in any way. Further, defendant was not subjected to coercive questioning during this interview. Rather, the police treated defendant as a person who might possess information relevant to Julius's disappearance because defendant was the last person known to have seen Julius. Moreover, as of March 2016, there was no evidence Julius's disappearance was connected to any criminal act.

Having reviewed the record, we are satisfied there is substantial evidence in the record supporting the judge's finding defendant was not in custody while being questioned by the police in December 2015 and March 2016 and that defendant gave these statements voluntarily. Thus, the judge correctly concluded no <u>Miranda</u> warnings were required.

II.

We next consider defendant's arguments that inadequate jury instructions deprived her of due process. Specifically, defendant contends: (1) the charges were complex and long, and did not include a tailored unanimity charge; (2) the

judge erred in failing to charge passion provocation manslaughter and attempted passion provocation manslaughter; and (3) the cooperating co-defendant charge was incomplete.  We reject these arguments.

"Appropriate and proper charges to a jury are essential for a fair trial." State v. Lora, 465 N.J. Super. 477, 501 (App. Div. 2020) (quoting State v. Green, 86 N.J. 281, 287 (1981)).  "Jury charges must provide a 'comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find."  State v. Singleton, 211 N.J. 157, 181-82 (2012) (quoting Green, 86 N.J. at 287-88).  Erroneous charges on fundamental issues are presumed to constitute reversible error.  State v. Carrero, 229 N.J. 118, 127 (2017).

"Objections to charges that are deficient in essentials will preserve these issues on appeal and will ordinarily result in a reversal."  Green, 86 N.J. at 289. Where a defendant does not object when a charge is given, as defendant failed to do in this case except as to the passion provocation charge, "there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case."  State v. Montalvo, 229 N.J. 300, 320 (2017) (quoting Singleton, 211 N.J. at 182).  Absent an objection, we review for plain error and "disregard any alleged error 'unless it is of such a nature as to have

41

been clearly capable of producing an unjust result.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting R. 2:10-2); see also State v. Adams, 194 N.J. 186, 206-07 (2008) ("Generally, a defendant waives the right to contest an instruction on appeal if he does not object to the instructions as required by Rule 1:7-2.").

Regarding jury instructions, "plain error requires demonstration of 'legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" State v. Chapland, 187 N.J. 275, 289 (2006) (quoting State v. Hock, 54 N.J. 526, 538 (1969)). The alleged charge error "is viewed in the totality of the entire charge, not in isolation." Ibid. "An appeal centered around jury instructions requires courts to read the charge as a whole, and not just the challenged portion, to determine its overall effect." State v. A.L.A., 251 N.J. 580, 591 (2022). "In addition, any finding of plain error depends on an evaluation of the overall strength of the State's case." Chapland, 187 N.J. at 289.

A.

Defendant contends the charge was overly complex and long. Specifically, defendant argues some charges were premised upon the State's

theory of accomplice liability, whereas the murder charge was premised upon the State's theory of liability based upon defendant's own conduct. Defendant contends these differing liability theories created a reasonable probability of juror confusion and a lack of unanimity, with some jurors finding defendant guilty of murder as Harris's accomplice—a theory not pursued by the State—and others finding her guilty of murder by her own conduct.

Because defendant failed to raise this argument at trial, we review for plain error. R. 2:10-2. After reviewing the record, we are satisfied there was no error related to the length or complexity of the jury charges.

Here, the judge instructed the jury on each charge in the indictment, as well as the lesser included offenses. Regarding the murder charge, the judge clearly instructed that the jury was required to find defendant caused Julius's death and specifically referred to the State's theory that defendant strangled Julius with an electrical cord.[12]

Regarding juror unanimity, the judge explained the jury did not have to be unanimous as to which form of murder was committed—whether defendant knowingly or purposely caused Julius's death or inflicted serious bodily injury resulting in Julius's death. However, to find defendant guilty of murder, the

---

[12] In count seven, the State claimed the electrical cord was the murder weapon.

judge stated that "all jurors must agree that the defendant either knowingly or purposely caused the death or serious bodily injury resulting in the death of Tyrita Julius."

Regarding the other charges, the judge instructed the jury could find defendant guilty based on accomplice liability or vicarious liability theories. The verdict sheet did not differentiate between the State's different theories of liability. However, the judge gave the jurors a written copy of the jury charge, which differentiated the State's liability theories. "When there is an error in a verdict sheet but the trial court's charge has clarified the legal standard for the jury to follow, the error may be deemed harmless." State v. Galicia, 210 N.J. 364, 387 (2012). Because the jury had a copy of the judge's charge, we are satisfied the jury followed the judge's written instructions in answering the questions on the verdict sheet.

On appeal, defendant failed to identify any specific error in the judge's jury charge or verdict sheet. Rather, defendant argues generally that the jury charge was too long and potentially confusing to the jury. Such a general argument fails to establish plain error in the judge's charge to the jury.

Further, the judge's instruction to the jury on the murder charge comported with the statutory language under N.J.S.A. 2C:11-3(a)(1) and (a)(2), as well as

Model Jury Charge (Criminal), "Murder" (rev. June 14, 2004). Moreover, in the context of the entire charge, the trial evidence, and the State's theory of the case as argued by the prosecutor, we discern no basis to conclude the jury was confused as to the elements for the murder charge. Nor was the jury confused as to the requirement of a unanimous conclusion that defendant committed purposeful or knowing murder by her own conduct and not based upon accomplice liability.

## B.

Next, defendant contends the judge erred in declining to issue a jury instruction on passion/provocation manslaughter as to the murder charge and the attempted murder charge. She argues the trial evidence supported charging passion/provocation because "the entire State's case rested on the theory that defendant's passions were inflamed as a result of a course of ill treatment by a paramour" who "kept leaving her for a man." We disagree.

At trial, defendant requested a passion/provocation manslaughter charge on the murder count. However, defense counsel did not request the charge on the attempted murder count. The judge rejected defendant's requested passion/provocation manslaughter charge, finding it was "not warranted by the evidence in the case."

45

N.J.S.A. 2C:1-8(e) provides: "The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." Where a defendant did not request a lesser-included offense charge, the charge must be given only if it is clearly indicated by the evidence. State v. Canfield, 252 N.J. 497, 501 (2023).

On the other hand, where a defendant requests an instruction on a lesser-included offense and the request is denied, we must determine "whether 'the evidence presents a rational basis on which the jury could (1) acquit the defendant of the greater charge and (2) convict the defendant of the lesser.'" Carrero, 229 N.J. at 128 (quoting State v. Brent, 137 N.J. 107, 117 (1994)). "If such a rational basis exists, a trial court's failure to give the requested instruction is reversible error." Ibid.

"The rational-basis test sets a low threshold." Ibid. "A defendant is entitled to a lesser-included offense instruction rationally supported by the evidence, even if the instruction is inconsistent with the defense theory." Ibid. "In deciding whether the rational-basis test has been satisfied, the trial court must view the evidence in the light most favorable to the defendant." Ibid.

"Passion/provocation manslaughter is an intentional homicide committed under extenuating circumstances that mitigate the murder." State v. Robinson,

136 N.J. 476, 481 (1994). Passion/provocation manslaughter, N.J.S.A. 2C:11-4(b)(2), consists of four elements: (1) adequate provocation; (2) insufficient time for defendant to cool off between the provocation and the killing; (3) defendant was actually impassioned by the provocation; and (4) defendant had not cooled off before the killing. Carrero, 229 N.J. at 129. "The first two elements are assessed objectively, while the third and fourth are 'more subjective because they relate to the defendant's actual response.'" Ibid. (quoting Robinson, 136 N.J. at 490). "To warrant the passion/provocation jury charge, the evidence must rationally support only the first two elements; the subjective elements 'should usually be left to the jury to determine.'" Ibid. (quoting State v. Mauricio, 117 N.J. 402, 413 (1990)).

The first element requires proof of provocation sufficient to arouse the passions of an ordinary person beyond the power of their control. Ibid. "Words alone are insufficient to create adequate provocation," but the presence of a weapon or conduct constituting a battery could be sufficient. Ibid. Under the second element, there is no specific timeframe to establish a cooling off period; instead, there must be a showing of insufficient time for a reasonable person in the defendant's position to cool off. Id. at 129-30.

Here, the judge correctly concluded there was no evidence adduced at trial to support a passion/provocation manslaughter charge. There was no evidence Julius did anything to arouse the passion of an ordinary person beyond the power of their control. Nor was there any evidence Julius ever used a weapon against defendant or physically abused defendant. While defendant may have been upset when Julius broke off their relationship, there was nothing in the record to support a passion/provocation manslaughter charge. See State v. Darrian, 255 N.J. Super. 435, 447-52 (App. Div. 1992) (rejecting a passion/provocation manslaughter charge premised upon a jealous rage following an argument, absent evidence of physical abuse or threat of physical harm); State v. McClain, 248 N.J. Super. 409, 413-14, 419-20 (App. Div. 1991) (rejecting a passion/provocation manslaughter charge premised upon the victim's repeated infidelity and where the incidents of the victim's abuse toward the defendant were remote in time to the victim's murder).

Furthermore, on this record, there was no evidence of an insufficient time for a reasonable person in defendant's position to cool off. To the contrary, based on the evidence, defendant planned the November 2015 shooting after spending several weeks monitoring Julius's cell phone communications to uncover evidence of Julius's infidelity. As it relates to the March 8, 2016

48

murder, the record indicates defendant spent the early morning hours searching Julius's cell phone records but thereafter spent the day with Julius, eating lunch, running errands, and visiting at defendant's home.

Having reviewed the record, we discern no error under these facts in the judge's denial of defendant's request for a passion/provocation manslaughter charge.

## C.

Defendant also argues the judge's charge regarding the testimony of a cooperating co-defendant was fatally incomplete. Because this portion of the jury charge omitted a sentence advising that Harris's guilty plea could not be used as evidence of defendant's guilt, defendant asserts the charge was critically flawed and warrants reversal of her conviction. See Model Jury Charge (Criminal), "Testimony of a Cooperating Co-Defendant or Witness" (rev. Feb. 6, 2006); see also Adams, 194 N.J. at 208 ("Although a co-defendant's guilty plea may be considered for credibility purposes, it may not be used as substantive evidence of the defendant's guilt."). Defendant contends the failure to include the omitted sentence, combined with the prosecutor's statements to the jury emphasizing Harris's obligation to testify truthfully under the cooperation agreement, resulted in prejudice.

49

Because defendant failed to raise this issue before the trial court, we review for plain error. R. 2:10-2. On this record, we discern no plain error in the judge's charge regarding the testimony of a cooperating co-defendant.

Consistent with the cooperating co-defendant model charge, the judge gave the following jury instruction:

> Now, Andre Harris[,] who was indicted for the crimes that defendant is on trial for[,] has testified on behalf of the State. Andre Harris, who was indicted for the crimes that defendant is on trial for, has pleaded guilty to some of those charges, mainly the first count of Indictment 1612-1998, charging Andre Harris with attempted murder of Tyrita Julius; the second count charging Andre Harris with attempted murder of [Julius's daughter]; a third count charging Andre Harris with conspiracy to commit the murder of Tyrita Julius; a fifth count charging Andre Harris with possession of a handgun for an unlawful purpose[;] and the eighth count charging Andre Harris with disturbing or desecrating human remains. Andre Harris also pled guilty to the first count of Indictment 1606-099[7] charging him with obtaining CDS by fraud. Andre Harris has testified on behalf of the State.
>
> Evidence of Andre Harris's pleas of guilty may be used only in determining the credibility or believability of his testimony. A jury has a right to consider whether a person who has admitted that they failed to comply with society's rules would be more likely to ignore the oath requiring truthfulness on the witness stand than a person who has never been convicted or pleaded guilty to a crime. You may consider such evidence along with all the other factors

A-3186-21

that I mentioned previously in determining the credibility of a witness.

The law requires that the testimony of such a witness be given careful scrutiny. In weighing Andre Harris's testimony, therefore, you may consider whether he has a special interest in the outcome of the case and whether his testimony was influenced by the hope or expectation of any favorable treatment or reward or by any feelings or revenge or reprisal. If you believe this witness to be credible and worthy of belief, you have a right to convict the defendant, Jennifer Sweeney[,] on his testimony alone provided, of course, that upon the consideration of the whole case you are satisfied beyond a reasonable doubt of defendant, Sweeney's, guilt.

The judge gave the foregoing instruction at defense counsel's request. Defense counsel did not object to the charge as read by the judge, notwithstanding the omission of the following sentence from the model charge: "However, you may not use [Harris's] plea of guilty as evidence that this defendant is guilty of the crimes that [she] is charged with." Model Jury Charge (Criminal), "Testimony of a Cooperating Co-Defendant or Witness." Regarding the omitted sentence, the model charge states: "There may be circumstances where this . . . sentence is not appropriate." Id. at n.3 (citing State v. Murphy, 376 N.J. Super. 114, 122-23 (App. Div. 2005)).

In Murphy, we considered the omission of this sentence from the cooperating co-defendant model charge. The trial judge in Murphy told the jury

that a court could only accept a plea agreement if the court was satisfied that the person pleading guilty was guilty of the offense. Id. at 121. The trial court gave the cooperating co-defendant charge but did not include the sentence informing the jury that the co-defendant's guilty plea could not be used as substantive evidence of defendant's guilt. Id. at 122. We concluded the facts in Murphy, where the victim was unable to identify the defendant or the co-defendant, required the trial judge "clearly define not only the limited use of the testimony but also the prohibited use of the testimony." Id. at 122-23. Based on the omission of the prohibited use instruction, coupled with other trial errors, we reversed the defendant's conviction and remanded for a new trial. Id. at 124-25.

In a case decided three years after Murphy, the New Jersey Supreme Court found the omission of the sentence in the cooperating co-defendant charge did not constitute plain error because: defense counsel "thoroughly cross-examined" the witness; the witness's "lack of credibility was a major theme in closing arguments for the defense, which asserted that [the witness] was a liar"; the witness's "detailed testimony . . . independently established his guilt of the crime and, therefore, his guilty plea added little weight to that testimony"; and the trial judge gave "the standard charge on credibility." Adams, 194 N.J. at 208-09 (citing State v. Stefanelli, 78 N.J. 418, 437 (1979)). Under the

circumstances presented in Adams, the Court concluded the error—failing to instruct the jury it should not consider the co-defendant's guilty plea as substantive evidence of the defendant's guilt—lacked a clear capacity to produce an unjust result and had a minimal effect on the outcome of the trial. Id. at 209.

Here, unlike the facts in Murphy, there was ample evidence of defendant's guilt without Harris's testimony as a cooperating co-defendant. Specifically, the evidence included defendant's cell phone communications, other cell phone records, and EZ Pass records. Further, the judge never made any statement to the jury that could remotely be construed as bolstering Harris's testimony. Additionally, defendant's attorney vigorously cross-examined Harris and, during summation, forcefully attacked his credibility.

Having reviewed the record as a whole, we are satisfied the jury was adequately instructed regarding its consideration and assessment of Harris's testimony. The judge's failure to read the omitted sentence in the cooperating co-defendant charge did not constitute plain error under these circumstances.

III.

We turn to defendant's argument for reversal of her conviction based on an irreversible taint in the integrity of the jury selection process. For the first time on appeal, defendant argues: (1) the trial judge allowed biased jurors to

taint the jury pool, including jurors who ultimately were empaneled and deliberated; (2) two of the selected jurors were not qualified to deliberate fairly and impartially and thus tainted the jury process, depriving defendant of a fair trial; (3) the judge erred in forcing a juror to participate and deliberate; (4) the judge improperly excused a juror without placing the reasons on the record; and (5) the judge failed to properly address COVID-related issues with the jury to ensure a fair and impartial trial. Because defendant did not raise these arguments before the trial court, we review for plain error. R. 2:10-2.

Criminal defendants have a constitutional right to be tried before an impartial jury. U.S. Const. amends. VI, XIV; N.J. Const. art. I, ¶ 10; State v. Little, 246 N.J. 402, 414 (2021). Jury voir dire is a key component to safeguarding that right. State v. Fortin, 178 N.J. 540, 575 (2004).

"The voir dire should be probing, extensive, fair[,] and balanced." State v. Papasavvas, 163 N.J. 565, 585 (2000). However, "a trial court's decisions regarding voir dire are not to be disturbed on appeal, except to correct an error that undermines the selection of an impartial jury." State v. Winder, 200 N.J. 231, 252 (2009).

The trial judge has broad discretion in the conduct of voir dire and the exercise of that discretion generally will not be disturbed on appeal. Little, 246

N.J. at 413. "The wide latitude afforded trial courts in the determination of a prospective juror's qualifications stems from the inability of appellate courts to appreciate fully the dynamics of a trial proceeding." State v. DiFrisco, 137 N.J. 434, 459 (1994).

> Decisions concerning the potential bias of prospective jurors are primarily subjective in nature. They require at bottom a judgment concerning the juror's credibility as he responds to questions designed to detect whether he is able to sit as a fair and impartial trier of fact. Consequently, such evaluations are necessarily dependent upon an observation of the juror's demeanor during the course of voir dire [−] observations which an appellate court is precluded from making.
>
> To be sure, in certain circumstances a venireman's potential for bias is sufficiently indicated by his past experiences that a refusal to excuse for cause will necessitate a reversal. In the majority of cases, however, whether or not to dismiss the challenged juror is heavily dependent upon subjective evaluations of his credibility.
>
> . . . .
>
> . . . Inasmuch as [a] trial judge observe[s] [a] venireman's demeanor, he [is] in a position to accurately assess the sincerity and credibility of . . . statements, and [an appellate court] should therefore pay due deference to his evaluation . . . .
>
> [State v. Singletary, 80 N.J. 55, 63-64 (1979) (citations omitted).]

"Probing inquiries are essential in uncovering hidden biases."  State v. Williams, 113 N.J. 393, 424 (1988).  However, there are "[n]o hard-and-fast rules" in determining whether removing a juror for cause is proper.  DiFrisco, 137 N.J. at 460.  That decision is left to the trial judge's sound discretion.  Ibid.

We "review[] the trial court's jury-related decisions under the abuse of discretion standard" because of the trial court's "unique perspective and the traditional deference we accord to trial courts in 'exercising control over matters pertaining to the jury.'"  State v. Brown, 442 N.J. Super. 154, 182 (App. Div. 2015) (quoting State v. R.D., 169 N.J. 551, 559-60 (2001)).

## A.

Defendant contends jury selection was tainted by the impaneling of juror number three.  During voir dire, the judge asked juror number three whether he thought the criminal justice system could be fair.  The juror responded "yes," explaining that people of different ethnicities and different opinions and belief systems come together to reach one conclusion, and he believed this showed "fairness."  This juror also told the judge the following:

> And just before we came on or yesterday when they were mentioning the case at what happened, or just, you know, briefly, a few people said, okay, of course, they wanted to leave and wanted to get it over with, and they were just saying consider the person to be guilty.  I mean, if the evidence is there, but then it's–there's a

A-3186-21

> reason why there's court, so I have to look at everything
> all different angles and actually prove a point.

Defendant contends the foregoing statement by juror number three during voir dire evidenced potential jurors in the pool believed defendant was guilty before completion of jury selection. Defendant asserts the statement by juror number three presented "extremely troubling, and arguably horrifying information," compelling a more complete inquiry of the potential jury pool by the trial judge.

Defendant's argument rests on nothing more than speculation. There was no evidence suggesting prospective jurors interacted with one another during jury selection or discussed methods for avoiding jury service. Even if such discussions occurred, the judge's voir dire of each prospective juror eliminated individuals who may have pre-judged defendant's guilt prior to the start of the trial. The judge had no obligation to conduct separate questioning of prospective jurors based upon juror number three's statement.

Ultimately, after considering juror number three's responses to the judge's questions, defendant's counsel found him "eminently qualified" to serve as a juror and raised no objection to seating him as a juror. On this record, we discern no abuse of discretion in the judge's questioning of the jury pool or, specifically, juror number three.

A-3186-21

B.

Defendant next argues the judge erred in seating two unqualified jurors. First, she asserts juror number thirteen was unqualified because he had mental health issues and difficulty understanding questions.

Juror number thirteen cogently responded to the judge's questions. The juror informed the judge he suffered from depression and anxiety, which "[c]ould" affect his ability to serve as a juror. However, the juror worked in a stressful job for more than thirty years and told the judge he could be a fair juror. Both counsel found juror number thirteen to be qualified. Neither counsel requested any further questioning by the judge related to the juror's ability to serve. Nor did counsel object to seating this individual as a juror.

Next, defendant asserts juror number six should have been excused due to medical issues. During jury selection, juror number six stated he had muscle spasms in his lower back which, at the time of jury selection, prevented him from sitting for long time periods. He explained this medical condition could interfere with his ability to be fair and impartial. However, this juror's responses to the judge's voir dire questions qualified him for jury service. Neither attorney objected to him being seated as a juror. More importantly, juror number six was qualified for jury service on July 15, 2021, and the trial did not start until nearly

58

a month later. If juror number six still suffered back spasms at the start of the trial, he likely would have so advised the judge and counsel regarding any limitation in his ability to serve as a juror.

Nothing on the record evinces the judge's abuse of discretion in seating juror number thirteen or juror number six.

## C.

Defendant next asserts the judge erred in "forcing" juror number two to participate and deliberate as a juror.

On the second day of trial, juror number two presented a letter from her employer to be excused from jury service. The judge denied that request because it was made after jury selection and after the jury had been sworn.

In accordance with Rule 1:7-2, defense counsel could have objected to the denial of the juror's request but did not do so. Nor did defendant's attorney request the judge conduct any further inquiry of juror number two regarding her ability to continue serving as a juror.

We are satisfied the judge did not abuse his discretion in retaining juror number two as a seated juror. There was no good cause to excuse this juror once the trial began. R. 1:8-2(d)(1); see State v. Jenkins, 182 N.J. 112, 124 (2004).

D.

Defendant also argues the judge erred in excusing juror number fifteen during the trial without any explanation. Defense counsel did not object to the judge's excusing this juror or request an explanation. Nor has defendant proffered any harm resulting from the excusal of juror number fifteen. On this record, we are satisfied there was no plain error in excusing this juror to warrant reversal of defendant's conviction.

E.

Additionally, defendant asserts the judge erred in failing to ask prospective jurors if they were comfortable serving on a jury during the COVID-19 pandemic. Because the judge did not question the jurors about the issue, she argues the judge failed to satisfy his obligation to ensure a fair and impartial jury. We disagree.

The record reflects the judge addressed the judiciary's COVID-related precautions and protocols during jury selection. See generally State v. Dangcil, 248 N.J. 114 (2021) (addressing the jury selection process as a result of COVID). Even after the jurors were initially qualified, certain jurors requested exemptions from jury service. The requested exemptions by jurors included not wanting to wear masks or being unable to wear masks. Defense counsel never

60

asked the judge to further explore COVID-related concerns with prospective jurors. Nor did defense counsel object to excusing jurors based upon COVID concerns.

We are satisfied the judge did not abuse his discretion in any aspect of the jury selection process. Nor was there plain error in the refusal to dismiss or to excuse jurors from service.

IV.

We turn to defendant's argument that a juror who allegedly refused to deliberate tainted the jury deliberation process. Defendant also asserts this issue calls into question the unanimity of the jury's verdict. However, defendant never raised this issue during the trial, so we review for plain error. R. 2:10-2.

The issue involved a note submitted to the judge by the jury after the jury began deliberating. The jury started deliberating at 2:02 p.m. on September 2, 2021. The jury recessed at 4:31 p.m. that day. At about 10:00 a.m. the next day, the judge received the following note from the jury: "We, the jury, have some concerns regarding some of the jurors. One juror is not willing to deliberate. Thank you."

The judge addressed the jury's note with counsel. While counsel discussed the note with the judge, and before the judge could respond to the jury regarding

61

that note, the judge received another note from the jury indicating it reached a verdict. Without objection from either counsel, the jury returned to the courtroom, and the verdict was read in open court. Thereafter, the judge polled the jury, and the verdict was deemed unanimous.

Jury issues are left to the sound discretion of the trial court, and we review such issues for abuse of discretion. R.D., 169 N.J. at 559-60. Here, we are satisfied there was no abuse of discretion. Based on the record, after the judge received the first note, the jury apparently resolved any issue without judicial intervention and rendered a unanimous verdict. We discern no basis for the judge to question the jurors regarding the note once the members of the jury seemingly resolved any issues among themselves and rendered a verdict.

V.

Next, defendant argues the judge erred in admitting the ME's testimony. She asserts the ME's testimony was speculative and consisted of net opinion. Further, defendant claims she lacked notice of portions of the ME's testimony, which deprived her of a fair trial. We reject these arguments.

Specifically, defendant asserts the ME's testimony that Julius died as a result of "homicidal violence including ligature strangulation" was speculative and not proffered within a reasonable degree of medical certainty. Defendant

62

claims the ME's opinion was supported solely by the existence of the electrical cord found around Julius's neck rather than any "physical, medical, or otherwise observable biological evidence."

Additionally, defendant contends the judge impermissibly allowed the ME to speculate that Julius may have suffered blunt force trauma or other significant head injury prior to being strangled. Defendant claims if she had notice of the ME's opinion related to blunt force trauma, she could have filed a motion to bar that testimony or, alternatively, retained her own expert to refute the ME's testimony. We reject these arguments.

Without objection from defense counsel, the judge qualified the ME as an expert in the fields of anatomic, clinical, and forensic pathology. The ME performed an autopsy on Julius's remains and saw the body in situ. Based on the ME's observations and autopsy, the ME testified he found: a "white electrical cord kind of draped over [Julius's] neck," as well as "discolorations of the neck musculature"; a "red[-]pink kind of discoloration, in [Julius's] left eye"; and head trauma in the form of discoloration of the scalp.

Regarding the scalp discoloration, defense counsel objected to the ME's testimony that Julius suffered blunt force trauma to her head. Counsel argued he had no report from the ME related to any blunt force trauma. Additionally,

counsel asserted the ME failed to establish his opinion regarding blunt force trauma was made within a reasonable degree of medical certainty.

The judge overruled defense counsel's objection. The judge explained he believed the State was not claiming blunt force trauma caused Julius's death. In overruling defendant's objection, the judge stated defense counsel would be able to cross-examine the ME as to the cause of death. Defense counsel proceeded to cross-examine the ME, and the cross-examination highlighted, rather than downplayed, the ME's blunt force trauma testimony.

Based on his training and experience, as well as his post-mortem examination of the body, the ME−within a reasonable degree of medical certainty−opined as to Julius's cause and manner of death. He testified the cause of death was "homicidal violence including ligature strangulation," and the manner of death was homicide. The ME explained "homicidal violence" was "a wastebasket term" used when he "can't have a specific mechanism for what caused the death." Additionally, the ME stated he included strangulation as a part of his finding, "[j]ust for the sheer reason that [he] ha[d] a ligature present."

Counsel extensively questioned the ME on the following: the ME's qualifications; the nature of ligature strangulation, including how many minutes it "could take" for the victim to die; the ME's inability to opine as to the exact

cause of Julius's death, including the ME's failure to check the box on the autopsy form indicating blunt trauma as an "additional circumstance" in the cause and manner of death; and the ME's specific finding of ligature strangulation notwithstanding that the electrical cord was not tied around Julius's neck. Further, defense counsel noted the absence of specific evidence in the ME's findings supporting ligature strangulation, such as marks on the neck, fingerprints around the throat, indication of a struggle, or specific fractures or hemorrhages in the body typically associated with strangulation. Ultimately, the ME conceded he was not "100 percent" certain as to the cause of Julius's death.

Where an objection is made to the trial court, we review the trial judge's evidentiary rulings for abuse of discretion. State v. Burney, 255 N.J. 1, 20 (2023). Here, defense counsel objected to the ME's testimony regarding blunt force trauma. However, defense counsel never objected to the ME's determination of death by homicidal violence including ligature strangulation as impermissible net opinion. Thus, as to that issue, we apply the plain error standard of review. R. 2:10-2.

The proponent of expert testimony bears the burden of proof on admissibility. State v. Torres, 183 N.J. 554, 567 (2005). N.J.R.E. 702 provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." This rule imposes three requirements for the admission of expert testimony:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [State v. Derry, 250 N.J. 611, 632-33 (2022) (quoting Torres, 183 N.J. at 567-68).][13]

"Those requirements are construed liberally in light of Rule 702's tilt in favor of the admissibility of expert testimony." State v. Jenewicz, 193 N.J. 440, 454 (2008).

Under N.J.R.E. 703:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before

---

[13] Well after completion of defendant's trial, the New Jersey Supreme Court issued its decision in State v. Olenowski, 253 N.J. 133 (2023). In Olenowski, the Court held, in determining reliability of scientific evidence under N.J.R.E. 702 in the future, courts should employ the test set forth in Daubert v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579 (1993). Id. at 138-39, 151-54.

the proceeding. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Defendant argues the ME's opinion as to Julius's cause of death constituted impermissible "net opinion." We disagree. "[T]he net opinion rule 'requires an expert to give the why and wherefore of his or her opinion, rather than a mere conclusion.'" State v. Townsend, 186 N.J. 473, 494 (2006) (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 401 (App. Div. 2002)).

Here, the ME determinations were not net opinion. The ME's opinions were based upon his education, training, and examination of Julius's body. The record indicated the body was found, decomposing, in a shallow grave in Harris's backyard. The body had an electrical cord, or ligature, around the neck. The ME testified his examination found no evidence of death by natural causes or other causative factors. Based on the body's decomposition, the ME was unable to provide an opinion on "a specific mechanism for what caused the death" or state with one hundred percent certainty the cause of death. However, the ME offered his opinion within a reasonable degree of medical certainty. See State v. Howard-French, 468 N.J. Super. 448, 465-66 (App. Div. 2021). The weight given to the ME's opinion was for the jury to resolve based on the

67

evidence, including the ME's testimony during cross-examination. Cf. Jenewicz, 193 N.J. at 466.

We also reject defendant's claimed discovery violation under Rule 3:13-3(b)(1)(I) related to the ME's report. Prior to trial, the prosecutor provided a copy of the ME's report to defense counsel. The report included a reference to discoloration on the underside of the skin of Julius's frontal scalp, as well as the determination of cause and manner of death. Further, the ME's testimony did not stray from his areas of qualified expertise. See State v. Jamerson, 153 N.J. 318, 337-38 (1998). In addition, the ME's report simply discussed the existence of discoloration without opining whether the discoloration constituted evidence of blunt force trauma. Nothing in the ME's report claimed blunt force trauma caused or contributed to Julius's death. Nor did the prosecutor pursue a theory of blunt force trauma in summation. Not once during closing argument did the prosecutor mention the possibility of blunt force trauma or the discoloration on Julius's scalp.

On this record, defendant failed to demonstrate a deprivation of her right to due process related to the ME's testimony.

## VI.

Defendant next argues prosecutorial error during the prosecutor's summation deprived her of a fair trial.  We disagree.

In criminal trials, prosecutors play a dual role:  vigorously representing the State's interests, while assuring the defendant is treated fairly and justice is done.  State v. Williams, 244 N.J. 592, 606-07 (2021).  Prosecutors are accorded "wide latitude" in arguing their case to the jury and may do so forcefully.  State v. Garcia, 245 N.J. 412, 435 (2021).  However, prosecutors must not misrepresent the law or the facts.  Id. at 435-36.  In presenting arguments, prosecutors should not stray from the evidence and the legitimate inferences that can be drawn therefrom.  Williams, 244 N.J. at 607.

However, "every prosecutorial misstep will not warrant a new trial." Garcia, 245 N.J. at 436.  We "must measure the prejudicial effect of the prosecutorial excesses against a defendant's fair trial rights."  Ibid.  A new trial is only warranted when, viewing the trial as a whole, the prosecutor's conduct was so egregious that it substantially prejudiced the defendant's right to have the jury fairly evaluate the evidence, leading to the possibility of an unjust result. Ibid.

Generally, a fleeting remark will not constitute grounds for reversal. <u>State v. Gorthy</u>, 226 N.J. 516, 540 (2016). "Trials, particularly criminal trials, are not tidy things. The proper and rational standard is not perfection; as devised and administered by imperfect humans, no trial can ever be entirely free of even the smallest defect. Our goal, nonetheless, must always be fairness." <u>State v. R.B.</u>, 183 N.J. 308, 333-34 (2005); <u>see also</u> <u>State v. Weaver</u>, 219 N.J. 131, 155 (2014) (noting a defendant is entitled to fair trial, not a perfect one).

"Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." <u>State v. Frost</u>, 158 N.J. 76, 83 (1999). "The failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made. The failure to object also deprives the court of an opportunity to take curative action." <u>Id.</u> at 84.

Here, defendant never objected to any remarks during the prosecutor's summation. Thus, we review for plain error. <u>R.</u> 2:10-2.

Defendant argues the prosecutor improperly shifted the burden of proof to the defense by commenting upon defendant's whereabouts at the time of Julius's shooting and disappearance. However, defendant mischaracterizes the prosecutor's argument.

Contrary to defendant's claim, the prosecutor did not state defendant was required to present an alibi. The prosecutor simply noted instances of defendant's peculiar behavior after Julius disappeared.

Nor did the prosecutor shift the burden of proof to the defendant. Rather, during the State's closing argument, the prosecutor merely highlighted defense counsel's failure to address the State's presentation of damaging evidence against defendant at trial. Defense counsel did not address the following trial evidence proffered by the State: the couple's breakup just before the November 2015 shooting; defendant's sudden belief after the shooting that the couple would be engaged; defendant's researching where Harris's children attended school; and defendant's cell phone communications and records, including the location of defendant's phone in Linden at the time of the shooting.

Having considered the record, we conclude the prosecutor's comments during closing argument were not improper references to defendant's failure to adduce evidence in response to the State's evidence or present an alibi. Defendant cherry picks the prosecutor's statements in isolation and fails to consider the overall context in which the comments were made. The prosecutor made these comments to support the inconsistencies between defendant's statements to the police and her statements to others.

A-3186-21

The prosecutor also focused on the failure of defendant's statements to cast doubt regarding other evidence of guilt presented by the State. For example, the prosecutor noted defendant told the police she took Julius to the Long Branch train station and then went to Donna's house in Long Branch. However, there was a significant time gap between defendant allegedly dropping Julius at the Long Branch train station and visiting Donna's home, located just minutes from the train station.

Nor did the prosecutor impermissibly refer to facts and inferences not based on evidence in the record. Specifically, defendant points to the following statements by the prosecutor regarding Julius's death: "If you're unconscious, and you're not breathing, it happens a lot quicker" and "I mean, it's a lot easier to strangle and kill someone when they're unconscious."

Contrary to defendant's assertion, these statements by the prosecutor were grounded in the evidentiary record. Moreover, many of the statements cited by defendant as improper were made by the prosecutor in response to defense counsel's summation.

Nor did the prosecutor improperly vouch for Harris's credibility. The prosecutor simply noted a party to a cooperation agreement must tell the truth; otherwise, any plea deal would be vacated. The prosecutor's comment was both

truthful and based on the evidentiary record. The prosecutor never offered any personal opinion regarding the truthfulness of Harris's testimony. See State v. Brown, 138 N.J. 481, 546 (1994) (noting testimony about the obligation to testify truthfully pursuant to plea agreement). The prosecutor's comment also responded to defense counsel's attack on Harris's credibility during summation. Additionally, the absence of any objection during closing arguments indicates defense counsel did not deem the prosecutor's statements improper. Frost, 158 N.J. at 83-84.

We discern nothing in the record to support defendant's claim that statements by the prosecutor during summation were impermissible or warrant the reversal of her conviction.

## VII.

We next consider defendant's argument that the judge impermissibly allowed the State to use her pre-arrest silence against her at trial. Alternatively, defendant argues "[a]t a minimum, a strong-worded limiting instruction should have been read to the jurors," and "[b]ecause that was not done here, the jury was left to proceed on the assumption that defendant's pre[-]arrest silence was evidence of her guilt."

Specifically, during Weisbrot's testimony, defendant contends the prosecutor's questions improperly suggested defendant had an obligation to help the police solve Julius's shooting by providing unsolicited information about Harris. Similarly, defendant argues the prosecutor's comments regarding defendant's failure to implicate Harris during her March 2016 statement to police were improper.

Because defendant objected to Weisbrot's testimony, we review the judge's evidentiary ruling for abuse of discretion. Burney, 255 N.J. at 20. However, defense counsel did not object to the prosecutor's comment on this issue during summation or request a limiting instruction, so we review these issues for plain error. R. 2:10-2.

There is a federal constitutional right against self-incrimination, U.S. Const. amends. V and XIV, and a state common law and statutory privilege against self-incrimination. State v. Santamaria, 236 N.J. 390, 411 (2019); State v. Kucinski, 227 N.J. 603, 616-17 (2017). "Under federal law, the use for any purpose at trial of a defendant's silence after his arrest and the administration of Miranda warnings violates his or her privilege against self-incrimination and his or her right to due process." State v. Stas, 212 N.J. 37, 57 (2012).

74

Under New Jersey law, "even silence that precedes the administration of Miranda warnings—if it is 'at or near' the time of a defendant's arrest—cannot be used for any purpose at trial." Id. at 57-58 (quoting State v. Elkwisni, 190 NJ. 169, 181 (2007)). "However, . . . pre-arrest silence that is not 'at or near' the time of arrest, when there is no government compulsion and the objective circumstances demonstrate that a reasonable person in a defendant's position would have acted differently, can be used to impeach that defendant's credibility with an appropriate limiting instruction." Id. at 58 (citing State v. Lawrence Brown, 190 N.J. 144, 158-59 (2007)). "It cannot, however, be used as substantive evidence of a defendant's guilt." Ibid.

We reject defendant's argument regarding the impermissible use of her pre-arrest silence during the trial. Here, defendant's voluntary statements to the police were not made "at or near" the time of her arrest. Although defendant did not receive Miranda warnings prior to providing either statement, no warnings were required because defendant was not in custody or a suspect at the time of her statements to the police. "Evidence of pre-arrest silence, in the absence of official interrogation, does not implicate the defendant's right against self-incrimination." State v. Messino, 378 N.J. Super. 559, 585 (App. Div. 2005).

Pre-arrest silence may be used to impeach a defendant. Jenkins v. Anderson, 447 U.S. 231, 238-39 (1980); see also State v. Brown, 118 N.J. 595, 615 (1990) ("[E]vidence regarding pre-arrest silence is admissible if, when viewed objectively and neutrally in light of all circumstances, it generates an inference of consciousness of guilt that bears on the credibility of the defendant when measured against the defendant's apparent exculpatory testimony.").

Although the judge likely erred in failing to advise the jury that evidence of defendant's silence could be used only to assess the credibility of her statements to the police, the omission of such a limiting instruction did not constitute plain error. Defendant's lies and omissions were evident from the cell phone records admitted as evidence during the trial. Moreover, the judge instructed the jury regarding its assessment of the credibility of defendant's statements to the police specifically and the credibility of witnesses generally.

On this record, we are satisfied defendant's constitutional rights were not violated as the evidence of defendant's pre-arrest silence was not clearly capable of producing an unjust result.

## VIII.

Defendant also challenges the sentence imposed. Defendant asserts the judge improperly relied on disputed facts in the pre-sentence report during his

sentencing decision. Additionally, defendant contends her sentence was disproportionate to the sentence imposed on Harris. We reject defendant's disproportionate sentencing argument. However, we are constrained to remand to the trial court for resentencing, relying solely on established facts.

A.

Our sentencing standard of review is well established. We review sentences "in accordance with a deferential standard." State v. Fuentes, 217 N.J. 57, 70 (2014). We "should not 'substitute [our] judgment for those of our sentencing courts.'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)). We will affirm the sentence unless the judge violated the sentencing guidelines, failed to weigh and balance the aggravating and mitigating factors based upon competent and credible evidence in the record, or imposed a sentence that shocks the judicial conscience. State v. Roth, 95 N.J. 334, 364-65 (1984).

At the sentencing hearing, the judge found the following aggravating factors applied: aggravating factor one, N.J.S.A. 2C:44-1(a)(1), "[t]he nature and circumstances of the offense, and the role of the actor therein, including whether or not it was committed in an especially heinous, cruel, or depraved manner"; aggravating factor three, N.J.S.A. 2C:44-1(a)(3), the risk that

77

defendant would commit another offense; aggravating factor nine, N.J.S.A. 2C:44-1(a)(9), the need for deterrence; and aggravating factor fifteen, N.J.S.A. 2C:44-1(a)(15), the fact that the offense involved an act of domestic violence.

Regarding the requested mitigating factors, the judge found the following factor applied: mitigating factor seven, N.J.S.A. 2C:44-1(b)(7), the defendant's lack of criminal history or history of delinquency. However, the judge gave this factor little weight. The judge rejected mitigating factors eight and nine, N.J.S.A. 2C:44-1(b)(8) and (9), which require "[t]he defendant's conduct was the result of circumstances unlikely to recur," and "[t]he character and attitude of the defendant indicate he is unlikely to commit another offense," respectively. In the judgment of conviction, the judge found the aggravating factors substantially outweighed any mitigating factors.

Having reviewed the record, we agree with defendant that the judge relied upon contested facts in his findings on the aggravating and mitigating factors, and those contested facts were incorporated in the judge's sentencing decision. Specifically, the judge relied on the following disputed facts: (1) disparaging remarks made about defendant by her ex-girlfriend and ex-wife; (2) finding Julius's daughter a second victim in the November 2015 shooting despite the judge's dismissal of the attempted murder count against defendant (count two);

and (3) defendant's role in precluding people from visiting Julius after the shooting because Julius's mother testified she made that decision at her daughter's request.

There was no evidence introduced at trial about defendant's prior romantic relationships. In fact, the State did not plan to use any statements it obtained from defendant's prior romantic partners unless defendant opened the door by seeking to introduce evidence of her good character. Because defendant never introduced any evidence of her good character at trial, there was nothing in the record regarding disparaging remarks from defendant's prior romantic partners.

The pre-sentence report contained negative statements about defendant and allegations of defendant's physical abuse by two of defendant's former romantic partners. Those statements in the pre-sentence report were never the subject of any hearing which would have allowed defendant to rebut those allegations.

At the sentencing hearing, the judge concluded the incidents described in the pre-sentence report regarding defendant's prior romantic relationships were relevant because defendant argued her good character in support of the requested mitigating factors. Based on our review of the sentencing transcript, the judge

relied on the incidents between defendant and her prior romantic partners in rendering his findings on the aggravating and mitigating factors.

Findings by a sentencing judge regarding aggravating and mitigating factors "must be supported by competent, credible evidence in the record," and cannot be based upon "[s]peculation and suspicion." Case, 220 N.J. at 64. It is improper for a sentencing judge to rely upon "unproven, disputed allegations of the presentence report" without conducting a hearing to resolve any factual disputes. State v. Hupka, 203 N.J. 222, 240-41 (2010).

Here, the sentencing judge did not conduct a hearing on the disputed facts in the pre-sentence report. As a result, we are constrained to remand for reconsideration of the judge's sentencing decision.

A defendant must be sentenced "anew" where resentencing is ordered unless the remand is for correction of a technical error, or the remand order is limited in scope. State v. Robinson, 217 N.J. 594, 610-11 (2014) (quoting State v. Randolph, 210 N.J. 330, 350 (2012)). Such a resentencing entails "a new analysis of the aggravating and mitigating factors" applicable to the defendant "as he appears on the day of resentencing." Randolph, 210 N.J. at 354. On remand, counsel may present arguments regarding the applicable aggravating and mitigating factors.

80

B.

We reject defendant's disparate sentencing argument. Defendant asserts the ninety-five-year sentence she received is not justified when compared to the sixteen-year sentence Harris received. A sentencing disparity "may invalidate an otherwise sound and lawful sentence." State v. Roach, 146 N.J. 208, 232 (1996). However, the fact that a co-defendant received a lighter sentence than a defendant does not establish a sentencing error. Ibid. Disparate sentences may be justified based on dissimilar defendants. Id. at 232-34.

Based on the record in this case, defendant was more culpable and committed more offenses against Julius than Harris. Additionally, Harris pleaded guilty to the charges against him and agreed to testify against defendant at her trial. Given these facts, even though defendant had no prior criminal record, the disparate sentences were justified. We discern no abuse of discretion in the sentence imposed upon defendant as compared to the sentence imposed on Harris.

We also reject defendant's argument that the judge erred in imposing two consecutive maximum NERA sentences. The judge heard counsel's arguments on whether to impose consecutive versus concurrent sentences. After considering the arguments, the judge explained his reasons for imposing

81

consecutive sentences. The judge found there were "two discre[te] and separate acts of violence against Ms. Julius at different times, different dates[,] and different locations." Having found there were two separate crimes, the judge stated:

> The sentences as to the first and fourth counts will run consecutive to the sentence imposed on the sixth and eighth counts from State v. [Yarbough]. The Court has found that the crimes set forth in the first and fourth counts and sixth and eighth counts were separate [acts] of violence committed on different dates, different times[,] and different locations. Even though these acts targeted the same victim, the [c]ourt does not find on this record that these acts were committed so closely in time and place, it must constitute a single period of abhorrent behavior.
>
> The facts and record suggest[,] as alluded to by the State[,] that there may have been a period of attempted reconciliation in the interim between the violent acts[,] further underscoring the separate[ness] of these acts.

On this record, the judge's imposition of consecutive sentences satisfied the requirements under State v. Yarbough, 100 N.J. 627, 643-44 (1985). The judge considered the relevant factors and stated his reasons in support of consecutive sentences.

Affirmed as to the conviction. Remanded for resentencing in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3186-21